15-3560 (L)
*Sleepy's LLC v. Select Comfort*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2016

(Argued: June 27, 2017   Decided:  November 27, 2018)

Docket Nos. 15-3560, 16-3595

───────────────────

SLEEPY'S LLC,
*Plaintiff-Appellant,*

v.

SELECT COMFORT WHOLESALE CORP., SELECT COMFORT RETAIL CORP., SELECT
COMFORT CORP.,
*Defendants-Appellees.*

───────────────────

Before:     SACK, HALL, AND DRONEY, *Circuit Judges.*

The plaintiff Sleepy's LLC agreed to purchase beds from the Select

Comfort defendants for resale in Sleepy's stores.  Thereafter, Sleepy's began to

suspect that Select Comfort was disparaging both Sleepy's stores and the

particular line of Select Comfort beds it sold.  It brought suit against Select

Comfort in New York State court, later removed to the United States District

Court for the Eastern District of New York, on several theories of liability,

including slander per se, breach of contract, unfair competition, breach of the

implied covenant of good faith and fair dealing, and the Lanham Act. After a bench trial, the district court (George C. Platt, *Judge*) dismissed the action. We vacated and remanded in part. On remand, the district court (Joanna Seybert, *Judge*) again entered a judgment for Select Comfort on the merits and concluded that attorney's fees were warranted because the case was "exceptional" under the Lanham Act.

Sleepy's appeals both the merits determinations and the fee award. We vacate and remand with respect to the district court's dismissal of Sleepy's slander claims because they had not been "published" under New York's law of defamation and remand for a determination by the court as to whether the plaintiff consented to each of the slanderous statements, except for the Zaffron incident as to which the district court already considered Sleepy's consent and as to which we affirm. As to the fee award, we direct the district court to apply on remand the standard articulated in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 134 S. Ct. 1749 (2014), for evaluating whether a Lanham Act claim is "exceptional." So as to justify the award of legal fees, we also conclude that the district court erred by not sufficiently explaining or justifying the

amount of the defendants' attorney's fees awarded under the Act.  Accordingly,

the district court's judgment is:

AFFIRMED in part, VACATED in part, and REMANDED.

PAUL D. SARKOZI (Lewis D. Prutzman, *on the brief*), Tannenbaum Helpern Syracuse & Hirschtritt LLP, New York, NY, *for Plaintiff-Appellant.*

ANDREW S. HANSEN (Heidi A.O. Fisher, *on the brief*), Fox Rothschild LLP, Minneapolis, MN, *for Defendants-Appellees.*

SACK, *Circuit Judge*:

At all relevant times, Sleepy's LLC ("Sleepy's" or the "plaintiff") was a bed

and mattress retailer obtaining products for resale from a variety of

manufacturers.  In that endeavor, it entered into a "Retail Partnership" with

Select Comfort[1]—a mattress manufacturer and retailer—to sell Select Comfort's

"Personal Preference" line of "Sleep Number" beds in Sleepy's stores.  As the

parties were aware, Select Comfort retained exclusive rights to sell its "Core"

(rather than Personal Preference) line of Sleep Number beds.

---

[1] The defendants are Select Comfort Wholesale Corporation, Select Comfort Retail Corporation, and Select Comfort Corporation.  We refer to them collectively as "Select Comfort."

Sleepy's was unhappy with its Personal Preference sales. It suspected that the poor performance resulted, at least in part, from Select Comfort's disparagement of both Sleepy's stores and the Personal Preference line of products that Sleepy's sold. Sleepy's CEO therefore arranged for its representatives to conduct "secret shops" at Select Comfort stores in an attempt to gather evidence for use in a possible lawsuit against Select Comfort to recoup the damage Select Comfort had allegedly inflicted on Sleepy's business.

Sleepy's asserts that its suspicions were confirmed and, accordingly, it brought this lawsuit. The amended complaint ultimately addressed by the district court contained ten alleged causes of action under six theories of liability: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) unfair competition, (4) slander per se, (5) fraudulent inducement, and (6) the Lanham Act. After a bench trial, the district court dismissed all the plaintiff's claims. On appeal, we vacated the district court's judgment in part and remanded the case to the district court. *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 206 (2d Cir. 2015). The case was reassigned to another judge upon its return to the district court. The court again decided in favor of Select

4

Comfort on all remaining claims against it and awarded Select Comfort

attorney's fees under the Lanham Act.

Sleepy's now argues that the district court improperly dismissed each of its

remaining claims, that attorney's fees should not have been granted, and that in

any event the attorney's fee award was excessive. As to the district court's

dismissal of its claims, we conclude that the court erred in dismissing Sleepy's

slander per se claims on the ground that the publication element cannot be met

under New York law when the statement in question is only made to the

plaintiff's representative. We therefore vacate the district court's dismissal of

Sleepy's slander claims and remand for the court to determine whether Sleepy's

consented to the allegedly defamatory statements.

We also vacate the district court's fee award judgment on two grounds:

First, we conclude that *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S.

545, 134 S. Ct. 1749 (2014), which sets forth the standard for determining whether

an award of attorney's fees under the Patent Act is permissible, also applies to

the Lanham Act. We therefore remand to the district court to determine whether

the defendants are entitled to attorney's fees under the *Octane Fitness* standard.

Second, we conclude that although district courts enjoy broad discretion in

apportioning attorney's fees under the Lanham Act, they must provide adequate justification for their apportionment. The district court's award based on its "overall sense" of what is appropriate in light of its familiarity with the lawsuit—which the district court relied on in the case at bar—is insufficient.

The judgment of the district court is therefore affirmed in part, vacated in part, and remanded for further proceedings.

## BACKGROUND

*Factual Background*

At all relevant times, Sleepy's LLC was a limited liability company organized under the laws of Delaware. It was a retailer selling to the public a variety of beds and mattresses manufactured by third parties. The defendants, Select Comfort Wholesale Corporation, Select Comfort Retail Corporation, and Select Comfort Corporation, are corporations incorporated under the laws of Minnesota. Select Comfort manufactures, produces, and sells its own mattresses and beds. Among its products is the Sleep Number Bed. The bed's mattress contains inflatable air chambers that can be adjusted to provide varying degrees of support for its user's body.

Beginning in 2000, Select Comfort launched a "Retail Partner" program. Through the program, "retail partners" would, pursuant to a contract entered into with Select Comfort, purchase a line of Select Comfort's Sleep Number mattresses and frames for resale in the partner's retail stores.

On June 17, 2005, Sleepy's and Select Comfort executed such an Agreement. Dealer Agreement, App'x 119-27. During the negotiations preceding the execution of the contract, representatives of Select Comfort explained to those of Sleepy's that its retail partners sold the "Personal Preference" line of Sleep Number beds, which were slightly different from the model sold in Select Comfort's own stores, the "Core" line. The primary difference between these models was the bedframe. The Core line used a plastic-polymer frame, while the Personal Preference line used a frame made of wood. Nevertheless, the district court found that "[t]he technology and basic components of the Personal Preference Line products were exactly the same as those of the Core Line, and they were both covered by the same warranty." *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 133 F. Supp. 3d 483, 488 (E.D.N.Y. 2015).

Sleepy's and Select Comfort maintained their retail partnership from June 17, 2005, through January 2007.[2] The results of Sleepy's efforts to sell the Personal Preference line of Sleep Number beds were disappointing. The parties disagreed as to the reason. Select Comfort asserted that the problems were attributable to Sleepy's failure to adequately advertise the product. Sleepy's contended to the contrary, however, that the poor performance was largely the result of Select Comfort's disparagement of the Personal Preference line being sold by Sleepy's.

Beginning in late 2006, Sleepy's sought evidence to support its position in the dispute. It arranged for "secret shopper" visits to Select Comfort retail stores during which persons acting on Sleepy's behalf, but pretending to be potential customers of Select Comfort, asked members of its sales staff about the differences between the Core bed sold by Select Comfort, and the Personal Preference line sold by Sleepy's. According to the district court's findings of fact, the first two secret shops were made on November 4, 2006, and November 5,

---

[2] Although the Dealer Agreement expired on September 30, 2006, Sleepy's continued to sell Sleep Number beds for several additional months.

2006, respectively.[3]  *See Sleepy's LLC*, 133 F. Supp. 3d at 489-91.  Sleepy's first secret shopper, Anthony Colon, alleged that a Select Comfort salesperson told him that Select Comfort's Core line of Sleep Number beds was superior to Sleepy's Personal Preference line because, among other things, the Core line was "made to order" and more comfortable.  *Id.*  Sleepy's second secret shopper was a Sleepy's district manager, Deborah Zaffron, who asserted that she was told by a Select Comfort salesperson that Sleepy's Personal Preference line was inferior, at least in part because Sleepy's mattresses were stored in a warehouse, its box springs could warp and break, and its beds were generally not protected by a warranty.  *Id.* at 491-92.

On November 6, 2006, Sleepy's founder and Chief Executive Officer Harry Acker was told about the results of the initial secret shops during a conference call with Sleepy's personnel, which was recorded.  He said:

> This may be an enormous, fabulous lawsuit for Sleepy's to collect damages . . . .  This may be very good because if we start getting involved in a lawsuit especially in a class action and its gets publicity it will not be good for them.  This cannot help them at all in the industry.  It

---

[3] There is some confusion in the record, however, as to whether the first shop occurred on September 4, 2006 or November 4, 2006.  *Sleepy's LLC*, 133 F. Supp. 3d at 489 n.8.  The discrepancy is immaterial.

won't mean a thing to the consumer, but it will for
people who want to do business with [Select Comfort].

*Id.* at 490 (internal citation omitted). Acker ordered additional secret shops, adding that there was "a good chance that [Sleepy's] can sue this man personally for defamation and slander. Make a note that we can sue him."[4] *Id.* (internal citation omitted).

Thereafter, between November 8, 2006, and February 6, 2007, Sleepy's conducted approximately ten additional secret shops. *Id.* at 492-94. Sleepy's alleges that its secret shoppers were told by members of Select Comfort's sales staff that the Core line's plastic-polymer frame was superior to the Personal Preference line's wood frame because it was stronger, sturdier, fresher, and less likely to warp or sag. *Id.* Some secret shoppers said that they had been told by sales personnel at Select Comfort stores that Sleepy's beds are exposed to moisture, pests, and allergens as a result of their having been stored in a warehouse; that Sleepy's offered inferior warranty terms; and that it is preferable to buy from the manufacturer directly to avoid Sleepy's "knockoffs." *Id.* at 492.

---

[4] It is not clear from the transcript or the district court's opinion to whom Acker is referring as "this man."

On January 3, 2007—before most of the additional secret shops were made—Sleepy's executives presented Select Comfort with the findings from its initial secret-shopper investigation. Sleepy's threatened litigation unless it received a letter from Select Comfort to the effect that it would cease making disparaging comments about the Personal Preference line of Sleep Number beds sold in Sleepy's stores. In response, Select Comfort's executives insisted that no such letter was necessary because the Dealer Agreement already contained non-disparagement provisions.[5] On January 11, 2007, as Sleepy's additional secret shops began, Select Comfort notified Sleepy's that it was terminating the retail

---

[5] That was apparently not true. The Dealer Agreement contained a unilateral non-disparagement provision that protected *Select Comfort* from a retail partner's efforts to divert customers from *Select Comfort's* retail stores:

> [Sleepy's will] [n]ot disparage Select Comfort or any product distributed through Select Comfort's retail stores or any of Select Comfort's other retail partners and not interfere with any of Select Comfort's retail store's [sic] relationships with customers or potential customers[.]

Dealer Agreement, Section 3(j), App'x 120. Although a sentence in the warranty provision did prohibit both parties from "impair[ing], infring[ing] upon or adversely affect[ing] the character, reputation and good will (collectively the 'Brand Image') of the other party," *id.* at Section 4(c), App'x 121, we agree with the district court that this sentence only applied to the warranty services, and not the mattresses themselves. *See Sleepy's LLC*, 133 F. Supp. 3d at 495-96.

partnership, which had been slated in the Dealer Agreement to terminate in September 2006.

*Procedural History*

On March 21, 2007, Sleepy's instituted this litigation in New York State Supreme Court, Nassau County. About six months later, on September 25, 2007, Select Comfort removed it to the United States District Court for the Eastern District of New York on grounds of diversity of citizenship. On February 8, 2008, the district court denied a motion by Select Comfort to dismiss the complaint. On January 6, 2010, Sleepy's filed an amended complaint comprising ten causes of action: two for breach of contract alleging that Select Comfort's statements violated the Dealer Agreement; one for fraudulent inducement alleging that Select Comfort misrepresented the quality of the Personal Preference line during contract negotiations; four for slander per se alleging that specified statements made to secret shoppers were defamatory; one for breach of the implied covenant of good faith and fair dealing alleging that Select Comfort acted in bad faith; one for unfair competition alleging that Select Comfort misappropriated its commercial advantage in bad faith; and one for a violation of the Lanham Act,

15 U.S.C. § 1051 *et seq.*, alleging that Select Comfort gave false and misleading descriptions of Sleepy's products.

In March 2012, the district court (George C. Platt, *Judge*) began a bench trial on the plaintiff's claims. After Sleepy's presented its evidence and rested its case, Select Comfort moved under Federal Rule of Civil Procedure 52(c) for judgment upon partial findings of fact. The district court granted the motion, deciding in favor of Select Comfort on all claims that remained in dispute. *Sleepy's LLC v. Select Comfort Wholesale Corp.*, No. 07-cv-4018, 2012 U.S. Dist. LEXIS 191002, at *50 (E.D.N.Y Sept. 26, 2012).

Sleepy's appealed the judgment, and this Court affirmed in part, vacated in part, and remanded with instructions to the district court to engage in further factfinding. *Sleepy's LLC*, 779 F.3d at 206. We vacated the district court's decision as to the unfair competition and breach of contract claims, which had been dismissed in the district court on the ground that "Sleepy's had presented no evidence of hostile conduct that took place prior to the expiration date [of the Dealer Agreement] of September 30, 2006." *Id.* at 198. We concluded that the district court's ruling was clearly erroneous because it rested on the mistaken understanding "that the [Dealer] Agreement could not be extended except by

13

written waiver and therefore necessarily ended on September 30, 2006." *Id.* Because the parties' relationship in fact extended well beyond the formal termination date specified in the Dealer Agreement, we vacated and remanded that part of the district court's order for consideration of whether the Dealer Agreement's non-disparagement clause prohibited Select Comfort's statements. *Id.*

We also vacated the district court's order dismissing Sleepy's slander per se claims, which had been based on the court's understanding "that Sleepy's solicited the allegedly defamatory statements and was therefore deemed in law to have consented to them, which precluded suit." *Id.* at 199. We concluded that the district court's judgment was "based on an incorrect understanding of the New York law of defamation," under which "[a]n honest inquiry or investigation by the person defamed to ascertain the existence, source, content or meaning of a defamatory publication is not a defense to an action for its republication by the defamer." *Id.* (internal quotation marks omitted). Accordingly, we remanded with instructions to the district court to "make findings . . . as to whether Sleepy's [secret-shopper] inquiries were motivated by a good faith attempt to learn

14

whether the Select Comfort sales force was carrying on a consistent pattern of slander, or were merely a ruse to decoy Select Comfort into a lawsuit." *Id.* at 201.

On remand to the district court, the case was reassigned to Judge Joanna Seybert. The parties agreed that the record that had been compiled before Judge Platt prior to the appeal was complete for purposes of Judge Seybert's consideration of the matter on remand, except for the testimony of two expert witnesses. The district court therefore heard these witnesses' testimony on July 21 and 22, 2015.

On September 22, 2015, the district court again decided in favor of Select Comfort on all its remaining claims. *Sleepy's LLC*, 133 F. Supp. 3d at 495-502. Specifically, the district court dismissed Sleepy's claim that Select Comfort breached the non-disparagement clause contained in § 4(c) of the Dealer Agreement on the ground that "the mutual obligation on the parties to not impair the respective brand image of their counterpart[] relates solely to the warranty service provided by Select Comfort in connection with the Personal Preference line." *Id.* at 495-96. The court concluded with respect to Sleepy's claim for breach of the implied covenant of good faith and fair dealing, that the Dealer Agreement was a sales contract that "is subject to the Uniform

15

Commercial Code, which imposes an obligation of good faith" but "does not beget a separate cause of action." *Id.* at 497 (internal quotation marks omitted). With respect to the unfair competition claim, the district court determined that "Select Comfort's sales representatives sought to distance their own products from those of the Personal Preference [l]ine; they endeavored to maximize their own competitive advantage, not usurp Sleepy's." *Id.* at 502. The district court acknowledged that Sleepy's claims might amount to product disparagement, but not unfair competition as alleged. *Id*.

Finally, regarding Sleepy's slander claims, the district court held that "all of [Sleepy's] claims for slander per se fail" because "[i]n all of the instances pleaded in the Amended Complaint, the allegedly defamatory statement was made *only* to Sleepy's representatives," and "[a] defamatory writing is not published if it is read by no one but the defamed." *Id.* at 499 (emphasis in original) (internal quotation marks omitted). Although the district court identified one instance in which a third party may have overheard a potentially slanderous statement, the court dismissed it on the ground that Sleepy's consented to the statement by eliciting it in bad faith. *Id.* at 499-500; *see also id*. at 500 ("[B]ecause the evidence shows that Sleepy's was both virtually certain that its inquiry would elicit

16

allegedly slanderous statements and substantially motivated by the desire to bolster a contemplated lawsuit, Sleepy's consented to the publication of these allegedly defamatory statements.").

After the completion of this second bench trial, Select Comfort moved for $4,539,305.93 in attorney's fees as the prevailing party in a Lanham Act case. The district court granted Select Comfort's request for fees in principle, finding that "there are substantial overtone[s] to suggest that the case was filed as a competitive ploy." *Sleepy's LLC v. Select Comfort Wholesale Corp.*, No. 07-cv-4018, 2016 WL 126377, at *4, 2016 U.S. Dist. LEXIS 3064, at *12 (E.D.N.Y Jan. 11, 2016) (brackets in original) (internal quotation marks omitted) (memorandum and order granting motion for attorney's fees). In the district court's view, "Sleepy's had undertaken a mission to gather ammunition for a future lawsuit against Select Comfort," making this an "exceptional case" for which fees are available under the Lanham Act. *Id.* (internal quotation marks omitted).

The district court did not, however, decide the amount of the fee award. Instead, it referred the case to United States Magistrate Judge Arlene R. Lindsay for her to determine the appropriate amount of attorney's fees to be awarded. The magistrate judge made findings of fact and recommended an award in the

amount of $3,507,388.65. *Sleepy's LLC v. Select Comfort Wholesale Corp.*, No. CV 07-4018 (JS)(ARL), 2016 WL 11266558, 2016 U.S. Dist. LEXIS 105290, at *28-29 (E.D.N.Y. Aug. 8, 2016), *report and recommendation adopted in part, rejected in part*, 222 F. Supp. 3d 169 (E.D.N.Y. 2016). The magistrate judge rejected Sleepy's argument that fees related to defending the Lanham Act claim should be separated from fees defending the non-Lanham Act claims because, as the magistrate judge decided, all the plaintiff's claims rested on a common set of operative facts and were "sufficiently intertwined" to permit full recovery. *Id.* at *19-20.

The district court adopted these findings in part, ultimately awarding Select Comfort seventy-five percent of the magistrate judge's recommended fee award, or $2,630,541.04. *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 222 F. Supp. 3d 169, 179-80 (E.D.N.Y. 2016). The court called it "beyond cavil that Plaintiff's [Lanham Act and non-Lanham Act] claims share common facts." *Id.* at 179. But it did not agree with the magistrate judge that those claims were so intertwined that it would be impossible to apportion fees between those claims. *Id.* It determined, instead, that a twenty-five percent reduction would be

reasonable based on what it called its "overall sense of th[e] suit." *Id.* at 179-80 (internal quotation marks omitted).

In this appeal, Sleepy's challenges both the merits determination and the fee determination. Regarding the merits, Sleepy's argues: First, that the district court erroneously held that the publication element of a cause of action for slander cannot be met under New York law when the statement is made to the defamed party's agent. Second, that the district court mistakenly dismissed its breach-of-contract claim by disregarding parol evidence that the parties intended the non-disparagement clause in § 4(c) of the Dealer Agreement to apply in non-warranty contexts. Third, that contrary to the district court's conclusion, Select Comfort breached the implied covenant of good faith and fair dealing under Minnesota state law. Fourth, that the district court erred by ruling in Select Comfort's favor on the unfair competition claim by disregarding evidence showing that Select Comfort in fact misappropriated Sleepy's "commercial advantage." Appellant's Brief 28.

Sleepy's also appeals the fee award against it on three grounds: First, it argues that the district court erred when it determined that Sleepy's Lanham Act claim was "exceptional" and therefore supported a punitive fee award. Second,

Sleepy's contends that the district court abused its discretion by apportioning seventy-five percent of the magistrate judge's recommended fee award when the Lanham Act claim was but one of ten causes of action alleged in the complaint. Third, Sleepy's argues that the district court incorrectly reviewed part of the magistrate judge's recommendations and findings for clear error, rather than *de novo*.

## DISCUSSION

We review findings of fact after a bench trial for clear error and accompanying conclusions of law *de novo*. *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 157 F.3d 956, 960 (2d Cir. 1998). With respect to the appeal from the fee award, we review the district court's decision for abuse of discretion. *Matthew Bender & Co., Inc. v. West Publ'g Co.*, 240 F.3d 116, 121 (2d Cir. 2001).

### I. The Merits Determination

We affirm the district court's decision to dismiss Sleepy's breach of contract, unfair competition, and implied covenant of good faith and fair dealing claims for the reasons relied upon by the district court. As to its dismissal of Sleepy's slander claims, however, we vacate the district court's judgment insofar as it dismisses Sleepy's slander claims because the communication in question

had not been "published."  We instruct the district court, on remand, to

reexamine whether Sleepy's consented to the slander claims.

Under New York law, the elements for a slander cause of action are "(i) a

defamatory statement of fact, (ii) that is false, (iii) published to a third party,

(iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault

on the part of the speaker, (vi) either causing special harm or constituting slander

per se, and (vii) not protected by privilege."  *Albert v. Loksen*, 239 F.3d 256, 265–66

(2d Cir. 2001).  The district court held that "all of Plaintiff's claims for slander per

se fail" because the publication element cannot be met when the defamatory

statements were "made *only* to Sleepy's representatives."  *Sleepy's LLC*, 133 F.

Supp. 3d at 499 (emphasis in original).  Although the court concluded that there

may have been one instance in which a third party overheard the defamatory

statement, when Zaffron called Select Comfort in the presence of a customer who

heard the disparaging remarks, satisfying the publication element, it held that

Sleepy's consented to that statement, barring Sleepy's slander claim.  *Id.* at 500.

Sleepy's argues that the district court erroneously determined that the

publication requirement could not be satisfied under New York law if a

defamatory statement was made to the defamed company's representatives.  We

21

agree.  In *Teichner v. Bellan*, 181 N.Y.S. 2d 842 (4th Dep't 1959), a New York

Appellate Division explained:

> There are decisions in some States that a communication of
> defamatory matter to an agent of the person defamed in response to
> an inquiry does not constitute a publication to a third person . . . [b]ut
> the better view seems to us to be that taken in another line of cases,
> holding that *the communication to the plaintiff's agent is a publication*,
> even though the plaintiff's action may ultimately be defeated for
> other reasons.  The agent is, in fact, a different entity from the
> principal; the communication to the agent is, in fact, a publication to
> a third person.

*Id.* at 249 (emphasis added) (internal citations omitted); *see also* 43A N.Y. Jur. 2d

Defamation & Privacy § 94 ("New York . . . adheres to the view that

communication to an agent of the defamed party constitutes publication . . . .");

*cf. Ostrowe v. Lee*, 256 N.Y. 36, 38 (1931) (deciding that a statement made to the

*slanderer's* agent constituted publication).  Although the New York Court of

Appeals does not appear to have addressed whether statements to a *plaintiff's*

agent constitute publication, this court is "bound . . . to apply the law as

interpreted by New York's intermediate appellate courts . . . unless we find

persuasive evidence that the New York Court of Appeals . . . would reach a

different conclusion."  *Zaretsky v. William Goldberg Diamond Corp.*, 820 F.3d 513,

521 (2d Cir. 2016) (brackets and internal quotation marks omitted).  Relying on

*Teichner* and finding no reason to think that the New York Court of Appeals

would decide otherwise, we conclude that Select Comfort's statements could

meet the publication element notwithstanding the fact that they were made to

Sleepy's representatives.  We, therefore, vacate the district court's dismissal of the

plaintiff's slander claims, since the dismissals were based on the conclusion that

the alleged slanderous statements were not "published" under New York law.

We nevertheless remand the matter to the district court for it also to

consider whether Sleepy's consented to the utterance of each of those statements.

In our previous decision, we observed:

> When a plaintiff sues for defamation based on a statement of the
> defendant elicited by the plaintiff with some reason to expect that
> the defendant's statement might be defamatory, the more the
> evidence supports the proposition that the plaintiff elicited the
> statement with a high degree of certainty that it would be
> defamatory, for the purpose of enabling a lawsuit, the stronger the
> defendant's case for deeming the statement consented to, thus
> barring the claim.

*Sleepy's LLC*, 779 F.3d at 201; *see also Teichner*, 181 N.Y.S. 2d at 846  ("[A] plaintiff

who had authorized an agent to make an inquiry on his behalf is not to be

charged with consent to a defamatory statement made in reply to the inquiry,

*unless he had reason to anticipate that the response might be a defamatory one. . . .*"

(emphasis added)).

The district court did, in fact, consider whether Sleepy's consented to one of the allegedly slanderous statements: when Zaffron called Select Comfort in the presence of a customer who overheard the disparaging remarks. *Sleepy's LLC*, 133 F. Supp. 3d at 499-500. The district court found that "the evidence shows that Sleepy's was both virtually certain that its inquiry would elicit allegedly slanderous statements and substantially motivated by the desire to bolster a contemplated lawsuit." *Id.* at 500. The district court relied on the fact that the incident occurred after Acker's statements of November 6, 2006, when he expressed his intent to sue Select Comfort. *Id.* We therefore agree with the district court's conclusion that Sleepy's consented to the disparaging statements with regards to the Zaffron incident and, to that extent, affirm the district court's judgment.

The district court did not, however, expressly decide whether Sleepy's consented to the remaining slanderous statements. In its opinion, the court noted that "[t]hough it need not visit the issue, the Court suspects that even if Plaintiff's other claimed instances of slander per se had been published, those claims would nonetheless be barred for the same reasons that any claim arising out of the Zaffron incident is." *Sleepy's LLC*, 133 F. Supp. 3d at 500 n.19. We

24

direct the district court, on remand, to make a determination as to whether Sleepy's consented to the remainder of the relevant statements and to determine whether, for that reason, those claims were properly dismissed.

## II. Fee Award Determination

Sleepy's also argues that the district court made errors regarding its fee determination, both in finding that Select Comfort was entitled to any legal fees as the prevailing party of an "exceptional" Lanham Act case and in the amount of the award. We agree. Although the inquiry may change somewhat depending on the court's determination of the substantive issues we are remanding to it, we nonetheless review it here both because the result may not change, and also because a review of the fee award will likely be useful and effective even if the damage award changes.

### 1. *"Exceptional Case" Under the Lanham Act*

Under Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), a court "may award reasonable attorney's fees to the prevailing party" in "exceptional cases." We have observed previously that the Lanham Act allows recovery of reasonable attorney's fees only "on evidence of fraud or bad faith." *Twin Peaks Prods., Inc. v. Publications Intl, Ltd.*, 996 F.2d 1366, 1383 (2d Cir. 1993) (quoting *Transgo, Inc. v.*

*Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1014 (9th Cir. 1985), *cert. denied*, 474 U.S. 1059 (1986)); *see also Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 751 (2d Cir. 1994). We have also affirmed a district court's decision to award attorney's fees under the Lanham Act if the lawsuit was "initiated as a competitive ploy," *Mennen Co. v. Gillette Co.*, 565 F. Supp. 648, 657 (S.D.N.Y. 1983), *aff'd*, 742 F.2d 1437 (2d Cir. 1984), or commenced "in bad faith merely to join in the profits from [the defendant]," *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 77 (2d Cir. 1986). The district court relied on these decisions in concluding that this case was "exceptional." *Sleepy's LLC*, 2016 WL 126377, at *4, 2016 U.S. Dist. LEXIS 3064, at *12.

In *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 134 S. Ct. 1749 (2014), the Supreme Court considered the meaning of "exceptional case" under the attorney's fees provision in the Patent Act, 35 U.S. Code § 285 – a provision that is identical to the Lanham Act's attorney's fees provision. *Octane Fitness*, 572 U.S. at 554. It concluded that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id.* The Court

26

encouraged district courts considering the question to evaluate the totality of the circumstances, considering a wide variety of factors, including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 1756 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)).

Many federal circuit courts, including the Third, Fourth, Fifth, Sixth, Ninth, and Federal Circuits, have since concluded that *Octane Fitness* applies to the Lanham Act's attorney's fees provision.[6] *See Romag Fasteners, Inc. v. Fossil, Inc.*, 866 F.3d 1330, 1334-36 (Fed. Cir. 2017); *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179, 1181 (9th Cir. 2016); *Baker v. DeShong*, 821 F.3d 620, 622–25 (5th Cir. 2016); *Georgia-Pacific Consumer Prods. LP v. von Drehle Corp.*, 781 F.3d 710, 720-21 (4th Cir. 2015), *as amended* (Apr. 15, 2015); *Slep-Tone Entm't Corp. v. Karaoke Kandy Store, Inc.*, 782 F.3d 313, 317-18 (6th Cir. 2015); *Fair Wind Sailing,*

---

[6] These courts observed, as we have above, that the language of the Lanham Act and Patent Act is identical, *Romag Fasteners, Inc.*, 866 F.3d at 1335; *Baker*, 821 F.3d at 622-25; *Georgia-Pacific Consumer Prods. LP*, 781 F.3d at 721; *Slep-Tone Entm't Corp.*, 782 F.3d at 318; *Fair Wind Sailing, Inc.*, 764 F.3d at 313-15, that Congress specifically mentioned the Patent Act when passing the Lanham Act, *Romag Fasteners, Inc.*, 866 F.3d at 1335-36; *Baker*, 821 F.3d at 623; *Fair Wind Sailing, Inc.*, 764 F.3d at 314-15, and that the statutes have parallel structure and purpose, *Baker*, 821 F.3d at 624.

*Inc. v. Dempster*, 764 F.3d 303, 313-15 (3d Cir. 2014). We now join them, concluding that under the Lanham Act, an exceptional case is one that stands out from others in the manner articulated by *Octane Fitness*, 572 U.S. at 554. It is on that basis that we vacate the district court's holding that Sleepy's brought an exceptional case under our prior Lanham Act precedent and remand for a new determination under *Octane Fitness*.[7]

*2. Fee Award*

Sleepy's also objected to the amount of the fee award: seventy-five percent of Select Comfort's total attorney's fees through September 25, 2012. We find the district court's high apportionment based solely on the empty, but eventually abandoned, Lanham Act claim puzzling at best.

---

[7] It is not altogether clear to us that the case at bar was "frivolous[]" or improperly "motivat[ed]." *Octane Fitness*, 572 U.S. at 554 n.6. Sleepy's claims survived summary judgment and were only dismissed after a bench trial on a motion for judgment on partial findings under Federal Rule of Civil Procedure 52(c). On appeal, we revived the unfair competition, breach of contract, and slander per se claims. And although Acker's comments strike us as objectionable and inappropriate, it is not self-evident that they alone could convert an otherwise-reasonable response to possible defamation (investigation and litigation) into a bad-faith competitive ploy. But the district court must decide this in the first instance—in conjunction with other relevant factors, such as Sleepy's spoliation—a decision to which we will owe deference in the event of a further appeal.

If the district court determines that no attorney's fee award is warranted under *Octane Fitness*, of course that will be the end of the matter, subject to further appeal if any. But if it again decides the case is "exceptional" under the Lanham Act, and that awarding attorney's fees is therefore warranted, we think it must revisit its approach to determining the amount of the award.

When the award of attorney's fees is justified, the district court must, of course, calculate the amount of the fees to which a prevailing party is entitled. Depending on the facts of the case, this can be challenging, there being no pole star by which the court can steer a true course. But the district court here correctly noted that "[t]he prevailing party in a multi-claim case which includes both Lanham Act and non-Lanham Act counts should be entitled to attorney fees *only* for work expended in prosecuting or defending the Lanham Act counts." *Sleepy's LLC*, 222 F. Supp. 3d at 176 (emphasis added) (quoting *N.Y. State Soc. of Certified Pub. Acct. v. Eric Louis Assocs., Inc.*, 79 F. Supp. 2d 331, 353 (S.D.N.Y. 1999)); *see also Gracie v. Gracie*, 217 F.3d 1060, 1069 (9th Cir. 2000) ("[W]e hold that as a general matter, a prevailing party in a case involving Lanham Act and non-Lanham Act claims can recover attorneys' fees only for work related to the Lanham Act claims."); *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185,

1193 (6th Cir. 1997) ("[U]nder 15 U.S.C. § 1117(a), attorneys' fees are recoverable only for work performed in connection with claims filed under the Lanham Act."). Limiting Lanham Act recovery to Lanham Act work "comports with the background rule in America—the prevailing party usually cannot recover fees absent statutory authority." *Procter & Gamble Co. v. Amway Corp.*, 280 F.3d 519, 527 (5th Cir. 2002).

The Fifth and Ninth Circuits have created a narrow exception to this rule, concluding that the prevailing party may recover for total attorney's fees incurred in a litigation containing *both* Lanham Act *and* non-Lanham Act claims if "the Lanham Act claims and non-Lanham Act claims are so intertwined that it is *impossible to differentiate* between" them. *Gracie*, 217 F.3d at 1069 (emphasis in original) (internal quotation marks omitted); *see also Procter & Gamble Co.*, 280 F.3d at 527 (5th Cir. 2002). Nevertheless, as the Ninth Circuit recognized:

> [T]he impossibility of making an *exact* apportionment does not relieve the district court of its duty to make *some* attempt to adjust the fee award in an effort to reflect an apportionment. In other words, apportionment or an attempt at apportionment *is required* unless the court finds the claims are so inextricably intertwined that even an estimated adjustment would be meaningless.

*Gracie*, 217 F.3d at 1070 (third emphasis added).

We would approach this "inextricably intertwined" line of reasoning with great care were we to address today whether or not to adopt the Fifth and Ninth Circuits' exception. Indeed, permitting full recovery for both Lanham Act and non-Lanham Act claims because of the difficulty of differentiating between them could permit, as might be the case here, a very small Lanham Act tail to improperly wag a huge attorney's-fee dog. But we need not opine on this possibly fraught approach here because the district court in the case before us concluded, correctly we think, that the claims here "are *not* 'so inextricably intertwined that even an estimated adjustment would be meaningless.'" *Sleepy's LLC*, 222 F. Supp. 3d at 179 (emphasis added) (quoting *Gracie*, 217 F.3d at 1070).

Although we agree with the district court that the Fifth and Ninth Circuit's exception, even were we to adopt it, does not apply here, we nevertheless vacate its fee award for its failure to provide a rationale for its apportionment decision sufficient to enable us to fulfill our responsibility to provide a meaningful review. *See Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 558 (2010) ("Determining a 'reasonable attorney's fee' is a matter that is committed to the sound discretion of a trial judge, but the judge's discretion is not unlimited. It is essential that the judge provide a reasonably specific explanation for all aspects of a fee

31

determination . . . . Unless such an explanation is given, adequate appellate review is not feasible." (internal citation omitted)); *Konits v. Valley Stream Cent. High Sch. Dist.*, 350 F. App'x 501, 504 (2d Cir. 2009) (summary order) ("Because we do not have such explanations to review, we cannot tell whether the court abused its discretion in reaching the determination to reduce by one third the attorney hours expended before [a specified date]."). The district court devoted significant time and care to describing the relevant legal standards and why the facts of this case render apportionment difficult. Unfortunately, it then summarily concluded that "[b]ased on [its] overall sense of this suit,"[8] it would "apportion seventy-five percent (75%) of the time billed through September 25, 2012, as time spent in relation to the Lanham Act claim." *Sleepy's LLC*, 222 F. Supp. 3d at 180 (internal quotation marks and brackets omitted). The district court provided no explanation to justify its apportionment; instead, it simply cited *Fox v. Vice*, 563 U.S. 826, 838 (2011), which noted that "[t]he essential goal in

---

[8] Judge Seybert's involvement in this case began long after the Lanham Act claim had been abandoned, further limiting our ability to accept her general and essentially unexplained apportionment decision. *See Konits*, 350 F. App'x at 504 ("[D]iscretionary reductions for limited success may be appropriate, but the district court did not provide an adequate explanation for the reductions, particularly in view of the judge's comparatively limited involvement in the case which would reduce his exposure to counsel's work over the full life of the litigation . . . .").

shifting fees [to either party] is to do rough justice, not to achieve auditing perfection." The goal may be rough justice, but it is justice still. And thus, some explanation is required.[9] Instead of untying this Gordian Knot, the district court seemed to cut it. We can neither untie nor retie it ourselves.

We are more familiar than we would care to be with complaints containing hopeless claims thrown in for reasons we can only guess. Here, the plaintiff brought what appears to be just such an all-but-the-kitchen-sink complaint, comprising ten causes of action and six theories of liability, only the last of which purportedly arose under the Lanham Act. Pl. Am. Compl., App'x 108-116. Indeed, in the introductory portion of the Amended Complaint, which generally summarized the plaintiff's claims to follow, the plaintiff did not so much as

---

[9] It is not at all clear to us why the district court found seventy-five percent of the fees to be reasonable. The district court acknowledged in its fee determination opinion that "certain of Plaintiff's claims were based on legal theories and/or factual allegations distinct from those underlying the Lanham Act claims," including the breach of contract, unfair competition, fraudulent inducement, and implied covenant of good faith and fair dealing claims – five of the ten causes of action, and four of the six theories of liability. *Sleepy's LLC*, 222 F. Supp. 3d at 179. In fact, the only claims the district court did not identify as distinct from the Lanham Act claims for the purposes of the fee award determination were the plaintiff's four slander per se claims. *Id.*

mention the Lanham Act. [10]  *Id.* at 97.  Moreover, in 2013, when the plaintiff first

appealed this case to this Court, it in effect abandoned its Lanham Act claim by

not appealing the district court's dismissal of it.  *Sleepy's LLC*, 779 F.3d at 196 n.3

(2d Cir. 2015) (noting the absence of an appeal with respect to the Lanham Act

and fraudulent inducement claims in the plaintiff's 2013 brief).  These factors

suggest that the Lanham Act claim was not the central thrust of the plaintiff's

lawsuit—nor a massive burden on the defendants' defense—and therefore may

not have accounted for most—or even much—of the attorneys' work.  Of course,

---

[10] The plaintiff described the "Nature of the Action" in its First Amended Complaint, in its entirety, as follows:

### Nature of the Action

This is an action to recover the damages Sleepy's suffered as a result of the tortious acts and breaches of contract that Select Comfort committed while Sleepy's was its "Retail Partner."  Select Comfort entered into a dealer agreement with Sleepy's and induced Sleepy's to commit valuable resources to promote and popularize Select Comfort's products.  As set forth herein, through a concerted pattern of defamation and disparagement of Sleepy's products and Sleepy's, express breaches of the dealer agreement, fraudulent misrepresentations, breach of the implied covenant of good faith and fair dealing contained in the dealer agreement, and unfair competition in violation of federal and New York law, Select Comfort damaged Sleepy's and effectively deprived it of the benefits of the dealer agreement.

Pl. Am. Compl., App'x 97.

the district court may have reasons for concluding otherwise, but it must tell us what they are before we attempt to further evaluate its decision.

We therefore vacate the judgment as to the attorney's fees award, and remand it to the district court to determine *de novo* whether the defendants are entitled to attorney's fees under the *Octane Fitness* standard, and, if so, to explain what amount of attorney's fees would reflect the proportion of Select Comfort's legal efforts spent defending against the Lanham Act claim.[11]

## CONCLUSION

We have considered the parties' remaining arguments on appeal and conclude that they are without merit. For the foregoing reasons, we AFFIRM the judgment of the district court in part, VACATE the judgment of the district court in part, and REMAND this matter to that court for further proceedings.

---

[11] While the issue is for the district court to address in the first instance upon remand, a useful starting point *might* reflect the fact that the Lanham Act claim was one of ten causes of action, or one of six theories of liability; that percentage can then be adjusted to account for common sets of facts, similar theories of liability, or other factors. But of course, the district court must decide its method and make its determination in the first instance, subject to our possible subsequent—albeit deferential—review.