Lorna G. Schofield, United States District Judge *118 WHEREAS, on March 12, 2019, Judge Lehrburger filed a Report and Recommendation (the "Report") recommending (1) dismissing Plaintiffs' Complaint with prejudice; (2) dismissing Defendants' counterclaims as moot without prejudice; (3) denying Defendants' request for summary judgment and (4) denying Defendants' request for an award of attorneys' fees;
WHEREAS, the Report stated that the parties "have fourteen (14) days to file written objections to this Report and Recommendation";
WHEREAS, no Objections were timely filed;
WHEREAS, in reviewing a Report and Recommendation of a magistrate judge, a district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). "In a case such as this one, where no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record." Poulos, v. City of New York , No. 14 Civ. 3023, 2018 WL 3745661, at *1 (S.D.N.Y. Aug. 6, 2018) (internal quotation marks omitted);
WHEREAS, the Court finds no clear error on the face of the record. It is hereby
ORDERED that the Report is adopted. Plaintiffs' Motion to Dismiss the Complaint and Defendants' counterclaims is GRANTED. Defendants' motion for summary judgment is DENIED. Defendants' application for an award of attorneys' fees is DENIED. The Clerk of Court is directed to close the case.
REPORT AND RECOMMENDATION ON MOTION TO DISMISS
ROBERT W. LEHRBURGER, United States Magistrate Judge.
TO THE HONORABLE LORNA G. SCHOFIELD, United States District Judge:
This is a trademark infringement case. Plaintiffs, Lifeguard Licensing Corp. ("Lifeguard") and its licensee, Popularity Products, LLC ("Popularity"), claim that the Defendants, Ann Arbor T-Shirt Company ("Ann Arbor") and its owner Jerry Kozak, infringed Lifeguard's "LIFEGUARD" trademarks for apparel and other items (the "Trademarks" or "Lifeguard Trademarks"). The Defendants assert several counterclaims for declaratory relief, including that the Trademarks are generic and should be cancelled. Shortly after the deadline for filing trial materials, Plaintiffs presented Defendants with a covenant not to sue (the "Covenant"). Plaintiffs now move to voluntarily dismiss their own claims pursuant to Fed. R. Civ. P. 41(a)(2) and also dismiss Defendants' counterclaims pursuant to Fed. R. Civ. P. 12(b)(1) on the basis that the Covenant renders the counterclaims moot. Defendants oppose dismissal of their counterclaims and ask the Court to enter summary judgment against Plaintiffs on counterclaims for constructive abandonment, find this case to be exceptional, and award Defendants their attorneys' fees. For the reasons below, I recommend (i) dismissing Plaintiffs' complaint with prejudice; (ii) dismissing Defendants' counterclaims as moot without prejudice; (iii) denying Defendants' request for summary judgment; and (iv) denying Defendants' request for an award of attorneys' fees.
*119 Background
A. The Parties and Their Products
Plaintiff Lifeguard owns four federally registered LIFEGUARD trademarks in the apparel category.[1] The Trademarks are incontestable as they have been in continuous use since registration.[2] See 15 U.S.C. § 1065. Plaintiff Popularity is Lifeguard's exclusive licensee of the Trademarks and sells summer and beachwear displaying the Trademarks, such as sweatshirts, t-shirts, hats, and tank-tops. (Complaint ¶¶ 22-24.) Most of Popularity's sales are on a wholesale level to airport souvenir shops, theme park stores, and beach town stores.[3]
Defendant Ann Arbor, based in Michigan, sells graphic t-shirts and other items.[4] Defendant Kozak is Ann Arbor's founder and co-owner.[5] (Kozak Decl. ¶ 3.) Among other items, Ann Arbor has sold t-shirts and tank-tops emblazoned with the word Lifeguard across the chest. (Kozak Decl. ¶¶ 4, 10.) Most all of Ann Arbor's sales have been made through Amazon.com. (Kozak Decl. ¶ 10.) In 2015, Ann Arbor's merchandise also automatically became available on eBay.com, although sales data indicates that no appreciable sales were made through eBay. (Kozak Decl. ¶¶ 18-19.)
Shortly after this dispute arose, Ann Arbor discontinued sales of its Lifeguard apparel. (Kozak Decl. ¶ 16.) For some time, however, Ann Arbor had been planning on expanding the items it offered imprinted with the word Lifeguard. (Kozak Decl. ¶ 55.) In that regard, Ann Arbor recently resumed sales of its shirts and now offers additional Lifeguard items, including hats, long-sleeved shirts, and hoodies. (Kozak Decl. ¶ 56.)
B. Start of the Litigation
This dispute began on September 25, 2015, when Plaintiffs sent Defendants a cease and desist letter, charging Defendants with "willful counterfeiting" of the Trademarks by selling LIFEGUARD branded apparel through Amazon.com.[6] The letter threatened litigation if Defendants did not promptly and permanently stop selling the apparel and paid Plaintiffs.
Plaintiffs' demand letter prompted discussions between the parties' counsel about potential resolution. (Kozak Decl. ¶¶ 42-52.) Amidst those discussions, Ann Arbor filed a federal action in Michigan seeking declaratory relief against Lifeguard. (See Heed Decl. ¶ 44.) Plaintiffs then filed this action in New York and moved to dismiss the Michigan action based on lack of personal jurisdiction. (See Dkt. 43.) That motion succeeded. (Dkt. 52.)
The complaint in this case asserts five causes of action: (i) trademark infringement;
*120 (ii) trademark counterfeiting; (iii) false designation of origin; (iv) common law unfair competition; and (v) violation of New York deceptive practices act. (Complaint ¶¶ 36-69.) On June 2, 2016, Defendants filed five counterclaims, all of which seek only declaratory relief. (Dkt. 77.) The counterclaims request declaratory judgment that (i) the Trademarks are generic and therefore cancellable; (ii) Plaintiffs have constructively abandoned the Trademarks due to failure to police and control the marks; (iii) Plaintiffs have constructively abandoned the Trademarks due to naked licensing; (iv) Defendants use of the word "Lifeguard" is a fair or descriptive use; and (v) Defendants' use is a permissible functional use. (Dkt. 77 ¶¶ 163-94.) Defendants' prayer for relief with respect to its counterclaims is entirely declaratory in nature. (Dkt. at p. 29-30, Prayer for Relief B.)
C. The Parties' Motion Practice
The case progressed as one might expect, with both parties making motions and cross-motions. Each party obtained only partial success with their motions.
For instance, in November 2015, Defendants moved to dismiss the complaint for lack of subject matter jurisdiction and personal jurisdiction. (Dkt. 13.) The Court found the subject matter issue was rendered moot when the Michigan case was dismissed and denied the motion, finding that the complaint made a prima facie showing of personal jurisdiction. (Dkt. 88 at 1, 8.)
In April 2016, the parties filed dueling motions to compel production of documents from each other. (Dkt. 48, 55.) Plaintiffs' motion to compel was denied as moot because Defendants eventually responded to the requests at issue. (Dkt. 74.) Defendants' motion was granted in part and denied in part. (Dkt. 73.) The Magistrate Judge denied Defendants' application for sanctions and costs against Plaintiffs. (Dkt. 73 at 12-13.) As the Court explained, "the plaintiffs' position, even where I have rejected it, had a substantial justification." (Dkt. 73 at 13.)
Then, in August 2016, Defendants filed a second motion to compel production of documents from Plaintiffs. (Dkt. 95.) Defendants also once again moved for sanctions for Plaintiffs' non-compliance. Again, the motion was granted in part and denied in part. (Dkt. 103.) Although finding one of Plaintiffs' argument frivolous, the Magistrate Judge denied sanctions because of the split outcome. (Dkt. 103 at 11, 14.) Out of the several issues addressed in the decision, Plaintiffs objected to only one. (Dkt. 104.) The District Judge overruled the objection and affirmed. (Dkt. 112.)
Defendants then filed a motion for contempt sanctions, claiming that Plaintiffs had not complied with prior discovery orders. (Dkt. 107.) The Magistrate Judge denied this third request for sanctions as well, finding in part that "[a]gain, Ann Arbor does not have its facts exactly right." (Dkt. 162 at 9.)
Both parties also filed motions to preclude the testimony of each other's respective trademark survey experts. (Dkt. 134, 152.) The Magistrate Judge denied both motions. (Dkt. 167.) Each party objected to the ruling against them; the District Judge overruled the objections and affirmed. (Dkt. 182.)
Finally, both parties filed motions for summary judgment. (Dkt. 192, 201.) Defendants moved for summary judgment on all of Plaintiffs' claims based on the affirmative defenses of fair use, functional use and abandonment. Plaintiffs opposed and, with one exception, cross-moved for summary judgment on all of Defendants' affirmative defenses and counterclaims. The *121 one exception was Defendants' defense and counterclaim that the Trademarks are generic; the Court had instructed the parties not to move on this issue since it was clearly an issue of disputed fact. (See Dkt. 229 at 2.)
The Court denied Defendants' motion seeking dismissal of Plaintiffs' claims. (Dkt. 229 at 21.) The Court granted Plaintiffs' motion in part and denied it in part, striking several affirmative defenses, including unclean hands, prior use and fraud. (Dkt. 229 at 21.) Accordingly, the case headed toward trial.
Having denied in part the motions for summary judgment, the Court issued a scheduling order setting dates for filing of motions in limine, jury materials, and other items, with a trial to take place starting December 3, 2018. (Dkt. 233.) Defendants timely filed the requisite documents. Plaintiffs did not. Rather, Plaintiffs made the decision to forego filing any trial motions or materials (including any opposition to Defendants' materials) and instead issue a covenant not to sue and move to dismiss the case.
Plaintiffs first expressed their intent to provide a covenant and move for dismissal during a telephone call with defense counsel on August 29, 2018. (Heed Decl. ¶ 24.) Plaintiffs did not actually provide the Covenant, however, until after Defendants had prepared and filed their trial materials. On December 1, 2018, the Court adjourned the trial, and, on December 5, 2018, issued an order authorizing Plaintiffs to file their motion to dismiss.[7] (Dkt. 250.)
D. Plaintiffs' Covenant Not to Sue and Motion to Dismiss
Plaintiffs presented Defendants with the Covenant for the first time on January 9, 2019, the same day Plaintiffs moved to dismiss. (Dkt. 257.) The Covenant was executed by both Plaintiffs and dated to be effective as of January 9, 2019.[8] The recitals indicate that Plaintiffs issued the Covenant because they "recently reached the conclusion" that Defendants' actions complained of "no longer infringe or dilute the Trademarks to warrant the substantial time and expense of continued litigation." (Grunsfeld Decl., Ex. 2.) In full, the Covenant reads as follows:
The Covenantors for and on behalf of themselves, their parent companies, subsidiaries, related companies, affiliated companies, licensees, as well as any other successors, directors, officers, employees, agents, and distributors; hereby unconditionally and irrevocably covenant to refrain from making or continuing any claim(s) or demand(s), or from continuing, commencing, causing or permitting to be prosecuted any action in law or equity, against Covenantees or their directors, officers, employees, pertaining to a cause of action based on or involving trademark infringement, unfair competition, or dilution, under state or federal law with respect to the LIFEGUARD MARKS, whether such cause of action arose before or after the Effective Date of this Covenant.
(Grunsfeld Decl., Ex. 2.)
On February 1, 2019, Plaintiffs provided sworn affidavits clarifying that the Covenant includes "any lawsuits against Amazon.com or Ebay.com relating to or pertaining to Defendants' sales of any product bearing the LIFEGUARD MARKS" and *122 to "any lawsuits against any of Defendants' customers, relating or pertaining to, the purchase of any of Defendants' products on Amazon.com or Ebay.com, bearing the LIFEGUARD MARKS." (Azrak Decl. ¶ 4; Tebele Decl. ¶ 5.)
Based on the Covenant, Plaintiffs move to voluntarily dismiss their own claims and dismiss Defendants' counterclaims. Plaintiffs contend that the Covenant removes any case or controversy between the parties and therefore deprives the Court of subject matter jurisdiction, eliminates Defendants' standing to assert their counterclaims, and renders Defendants' counterclaims moot. In opposition, Defendants argue that the Covenant was tendered belatedly in bad faith and is not sufficiently robust to moot their counterclaims. In addition to opposing Plaintiffs' motion to dismiss, Defendants seek summary judgment on their second and third counterclaims, contending that the Covenant is new proof of Plaintiffs' constructive abandonment. Defendants also ask for an award of their attorneys' fees.
Discussion
I. Plaintiffs May Voluntarily Dismiss Their Complaint
A plaintiff's voluntary motion to dismiss their complaint is governed by Federal Rule of Civil Procedure 41(a). When, as here, the motion is made after a defendant has answered the complaint and does not stipulate to dismissal, the "action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper. If a defendant has pleaded a counterclaim before being served with the plaintiff's motion to dismiss, the action may be dismissed over the defendant's objection only if the counterclaim can remain pending for independent adjudication." Fed. R. Civ. P. 41(a)(2). Plaintiffs filed their motion to dismiss long after Defendants asserted their counterclaims. Accordingly, the existence of Defendants' counterclaims ordinarily could pose an impediment to dismissing the action.
Plaintiffs, however, have simultaneously moved to dismiss all of Defendants' counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(1). As explained below, the Court agrees that all counterclaims should be dismissed because the Covenant eliminates any case or controversy, renders the counterclaims moot, and eliminates the Court's subject matter jurisdiction. As the Second Circuit has explained in similar circumstances where a covenant not to sue served as the basis for a motion to dismiss, "[w]hen a plaintiff seeks to withdraw its claims pursuant to Rule 41(a)(2), but another event independently deprives the district court of an Article III case or controversy involving the defendant's counterclaims, Rule 41(a)(2) is irrelevant." Nike, Inc. v. Already, LLC ("Nike, Inc. "), 663 F.3d 89, 94 (2d Cir. 2011), affirmed sub nom. Already, LLC v. Nike, Inc. ("Already, LLC "), 568 U.S. 85, 133 S.Ct. 721, 184 L.Ed.2d 553 (2013). That is precisely the case here: Plaintiffs' Covenant is an independent event depriving the court of an actionable case or controversy. Accordingly, Rule 41(a)(2) is "irrelevant," and the counterclaims do not stand in the way of dismissing the complaint.
II. Plaintiffs' Covenant Renders Defendants' Counterclaims Moot and Deprives the Court of Subject Matter Jurisdiction
A. Applicable Law Governing Declaratory Judgment Jurisdiction and Covenants Not To Sue
A party may move to dismiss claims or counterclaims for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Each of Defendants'
*123 five counterclaims are claims for declaratory judgment. Accordingly, the basis for the Court's subject matter jurisdiction is the Declaratory Judgment Act, which provides in relevant part: "In a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration ...." 28 U.S.C. § 2201(a).
"[T]he phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III" of the United States Constitution. MedImmune, Inc. v. Genentech, Inc. , 549 U.S. 118, 127, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) (quoting Aetna Life Insurance Co. v. Haworth , 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937) ). An "actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." Alvarez v. Smith , 558 U.S. 87, 92, 130 S.Ct. 576, 175 L.Ed.2d 447 (2009) (internal quotation marks omitted). The controversy must at all times remain "definite and concrete." MedImmune , 549 U.S. at 127, 127 S.Ct. 764. In sum, " '[t]hroughout the litigation,' the party seeking relief 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.' " United States v. Juvenile Male , 564 U.S. 932, 936, 131 S.Ct. 2860, 180 L.Ed.2d 811 (2011) (quoting Spencer v. Kemna , 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) ).
Accordingly, when an actual controversy ceases to exist, there can be no claim under the Declaratory Judgment Act, and the court loses subject matter jurisdiction. "A case becomes moot - and therefore no longer a 'Case' or 'Controversy' for purposes of Article III - 'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.' " Already, LLC, 568 U.S. at 91, 133 S.Ct. 721 (quoting Murphy v. Hunt , 455 U.S. 478, 481, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) ). "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.' " Id. at 91, 133 S.Ct. 721 (quoting Alvarez , 558 U.S. at 93, 130 S.Ct. 576 ).
One way in which a case can become moot is when the defendant or counter-defendant issues a covenant not to sue. "As the Supreme Court has recognized, a covenant not to sue a declaratory judgment plaintiff can moot a controversy between the parties." Organic Seed Growers and Trade Association v. Monsanto Co. , 718 F.3d 1350, 1357 (Fed. Cir. 2013) (referring to Already, LLC , 568 U.S. at 100, 133 S.Ct. 721 ). Intellectual property cases such as this one are a prime example. "When a declaratory judgment plaintiff seeks a declaration that an asserted right is invalid or otherwise unenforceable and the declaratory defendant provides the plaintiff with a covenant not to sue for infringement of that right, that covenant can 'extinguish any current or future case or controversy between the parties, and divest the district court of subject matter jurisdiction.' " Velvet Underground v. Andy Warhol Foundation For The Visual Arts, Inc. , 890 F.Supp.2d 398, 404 (S.D.N.Y. 2012) (alterations omitted) (quoting Dow Jones & Co., Inc. v. Ablaise Ltd. , 606 F.3d 1338, 1348 (Fed. Cir. 2010) ). Even more specific to this case, "[i]n trademark cases seeking relief under [ ] the Declaratory Judgment Act ... a valid covenant not to sue may strip district courts of jurisdiction." Nike, Inc. , 663 F.3d at 94-95 ; see also *124 Tequila Cuervo la Rojena, S.A. v. Jim Beam Brands Co. , No. 10 Civ. 203, 2011 WL 407938, at *2 (S.D.N.Y. Feb. 8, 2011) (holding that unilateral stipulation not to sue for past, present or future use of trademark was "sufficient to moot this action and require dismissal for lack of subject matter jurisdiction").
Not all covenants to sue, however, will moot a controversy.[9] "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." Already, LLC , 568 U.S. at 91, 133 S.Ct. 721. The ultimate question, referred to as the "voluntary cessation" test, is "[c]ould the allegedly wrongful behavior reasonably be expected to recur?" Id. at 92, 133 S.Ct. 721. To answer that question and determine "whether a covenant not to sue eliminates a justiciable case or controversy in a declaratory judgment action involving a trademark," the Second Circuit has directed courts to consider the totality of the circumstances and "in addition to other factors: (1) the language of the covenant, (2) whether the covenant covers future, as well as past, activity and products, and (3) evidence of intention or lack of intention, on the part of the party asserting jurisdiction, to engage in new activity or to develop new potentially infringing products that arguably are not covered by the covenant." Nike, Inc. , 663 F.3d at 96 (footnotes omitted).[10]
The burden of establishing that a covenant not to sue extinguishes a controversy lies with the party providing the covenant. The burden is not a light one: a party " 'claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.' " Already, LLC , 568 U.S. at 91, 133 S.Ct. 721 (quoting Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc. , 528 U.S. 167, 190, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) ). As the party attempting to moot its case, it is therefore "[Lifeguard]'s burden to show that it 'could not reasonably be expected' to resume its enforcement efforts against [Ann Arbor]." Id.
B. The Supreme Court's Decision in Already v. Nike
The Supreme Court's decision in Already v. Nike illustrates application of these principles. In Already , Nike sued Already for trademark infringement, claiming that the design of Already's shoe infringed and diluted Nike's trademark for the design of its shoe. Nike, Inc. , 663 F.3d at 91-92. Already counterclaimed for declaratory *125 judgment that Nike's registration was not in fact a "trademark" and therefore cancellable. Id. at 92. Eight months after filing its complaint, and four months after Already filed its counterclaims, Nike presented Already with a covenant not to sue. Already, LLC , 568 U.S. at 88-89, 133 S.Ct. 721. Nike then moved to dismiss its claims with prejudice and to dismiss Already's counterclaim without prejudice on the ground that the covenant extinguished the case or controversy. Id. at 89, 133 S.Ct. 721. Already opposed and submitted affidavits stating that Already had plans to introduce new versions of its shoes; that Nike had intimidated retailers into refusing to carry Already's shoes; and that investors would not consider investing in Already until Nike's trademark was invalidated. Id. at 89, 133 S.Ct. 721. The district court granted Nike's motions. Nike, Inc. v. Already, LLC , No. 09 Civ. 6366, 2011 WL 310321 (S.D.N.Y. Jan. 20, 2011). The Second Circuit affirmed as did the Supreme Court.
Nike's covenant not to sue was broad. Nike committed to:
"refrain from making any claim(s) or demand(s) or from commencing, causing, or permitting to be prosecuted any action in law or equity against [Already] or any of its [successors or related entities and their customers], on account of any possible cause of action based on or involving trademark infringement, unfair competition, or dilution under state or federal law ... relating to the NIKE Mark based on the appearance of any of [Already]'s current and/or previous footwear product designs, and any colorable imitations thereof, regardless of whether that footwear is produced, distributed, offered for sale, advertised, sold, or otherwise used in commerce before or after the Effective Date of this Covenant."
Nike, Inc. , 663 F.3d at 92 ;[11] see also Grunfeld Decl. Ex. 2 (copy of Nike's covenant). The covenant thus covered any action based on trademark infringement, unfair competition and dilution; in both law and equity; against Already as well as its customers and distributors; regarding both current and previous designs, and "any colorable imitations" of those designs; based on events both before and after the covenant's effective date.
The Supreme Court held that Nike's covenant satisfied the burden imposed on it by the voluntary cessation test. 568 U.S. at 93, 133 S.Ct. 721. In so holding, the Court noted the following features in particular. The covenant was unconditional and irrevocable. It prohibited Nike from making demands as well as filing suit. It covered not only Already but also its distributors and customers. And it covered "not just current or previous designs, but any colorable imitations." Id. Moreover, Nike represented in court that there was no prospect for a shoe that would infringe Nike's trademark yet would not fall under the covenant. Id. at 93-94, 133 S.Ct. 721. The Court concluded that "[i]f such a shoe exists, the parties have not pointed to it, there is no evidence that Already has dreamt of it, and we cannot conceive of it;" Nike thus met its burden. Id. at 94, 133 S.Ct. 721.
But the Court's analysis did not stop there. "Given Nike's demonstration that the covenant encompasses all of its allegedly unlawful conduct, it was incumbent on Already to indicate that it engages in or has sufficiently concrete plans to engage in activities not covered by the covenant. After all, information about Already's business activities and plans is uniquely within *126 its possession." 568 U.S. at 94, 133 S.Ct. 721. The Court found lacking Already's statement that it "currently has plans to introduce new shoe lines and make modifications to existing shoe lines." Id . at 95, 133 S.Ct. 721. The Court also found of no consequence Already's evidence that Nike's conduct had deterred retailers from selling Already's shoes and investors from investing in the company. Any such concern going forward was speculative, particularly now that Nike had provided a covenant ensuring the absence of such a threat in the future. Id. at 95-100, 133 S.Ct. 721. In sum, the Court explained "given the covenant's broad language, and given that Already has asserted no concrete plans to engage in conduct not covered by the covenant, we can conclude the case is moot because the challenged conduct cannot be reasonably expected to recur." Id. at 95, 133 S.Ct. 721.
C. Plaintiffs Have Met Their Burden
The Covenant provided by Lifeguard to Ann Arbor satisfies the voluntary cessation test. The Covenant is similar to that in Nike, although it certainly is not identical. Like the Nike covenant, the Lifeguard Covenant is unconditional and irrevocable. Like the Nike covenant, the Lifeguard Covenant applies to both actions and demands. Like the Nike covenant, the Lifeguard Covenant applies to actions in both law and equity. Like the Nike covenant, the Lifeguard Covenant covers any action based on trademark infringement, unfair competition and dilution. Like the Nike covenant, the Lifeguard Covenant applies to actions arising both before and after the covenant's effective date. (Compare Grunsfeld Decl. Ex. 1 with Ex. 2.)
This Court is hard pressed to conceive of any product Defendants could market that would infringe the Lifeguard Trademarks but would not be covered by the Covenant. Plaintiffs state that "no such example exists." (Plaintiffs' Reply Memorandum in Support of the Motion to Dismiss ("Pl. Reply"), at 9.) And, just as Nike made representations in court regarding the breadth of its covenant, 568 U.S. at 94, 133 S.Ct. 721, so here Plaintiffs represent that the Covenant "precludes [Plaintiffs] from taking further enforcement against Defendants for any past or future infringement of the LIFEGUARD MARKS." (Pl. Reply at 9.)
Defendants do state that Ann Arbor "had been planning on expanding its offering of gear emblazoned with the word, 'lifeguard,' at the conclusion of this litigation." (Kozak Decl. ¶ 55.) But that statement gains no more ground for Defendants than did Already's statement that it "currently has plans to introduce new shoe lines and make modifications to existing shoe lines." 568 U.S. at 95, 133 S.Ct. 721. First, any such product would be covered by the Covenant because it broadly "precludes [Plaintiffs] from taking further enforcement against Defendants for any past or future infringement of the LIFEGUARD MARKS." (Pl. Reply at 9.) Second, as Plaintiffs emphasize (Pl. Reply at 6, 9), Defendants added the "Lifeguard" expansion products prior to the end of this litigation. By doing so, Defendants own actions show that even they recognize that the Covenant encompasses such additional products. Third, while bringing its new products to the Court's attention, Defendants nowhere argue that those products would not be covered by the Covenant. Were it otherwise, by expanding their "Lifeguard" product line in the absence of coverage, Defendants would only have been strengthening Plaintiffs' argument for willful infringement.
In short, just as Nike did, Plaintiffs have demonstrated "that the Covenant encompasses all of its allegedly unlawful conduct."
*127 568 U.S. at 94, 133 S.Ct. 721. "Given the covenant's broad language, and given that [Ann Arbor] has asserted no concrete plans to engage in conduct not covered by the covenant, we can conclude the case is moot because the challenged conduct cannot be reasonably expected to recur." Id. at 95, 133 S.Ct. 721.
Defendants nevertheless point to five aspects of the Covenant that differ from the Nike covenant, which, Defendants argue, render the Covenant insufficient to moot the parties' controversy underlying Defendants' counterclaims for declaratory judgment. (Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion to Dismiss ("Def. Mem."), at 18-20.) None of these arguments, however, lead to a different outcome.
First, Defendants fault the Covenant for not covering Ann Arbor's distributors and customers. If, and to the extent that was a deficiency, however, the issue became moot when Plaintiffs provided sworn declarations clarifying the Covenant in this regard. As those declarations explain, the Covenant did not expressly refer to Ann Arbor's distributors because Plaintiffs had understood that Ann Arbor's sole sales channel was to customers purchasing directly through Amazon.com or eBay.com. (Azrak Decl. ¶ 3; Tebele Decl. ¶ 4.) Defendants have confirmed that is correct insofar as sales of all of Ann Arbor's Lifeguard merchandise takes place by customers' purchases on Amazon.com and eBay.com. (Kozak Decl. ¶¶ 10-29.) Plaintiffs also explained that "[i]t seemed unnecessary to refer to 'customers' as we assumed it was taken for granted that [Plaintiffs] would never sue Defendants' customers, all of whom purchase Defendants' Lifeguard products in quantities of one or two units or other similar trivial amounts." (Azrak Dec. ¶ 3; Tebele Decl. ¶ 4.) To lay the issue to rest, Plaintiffs expressly aver that they will not pursue any enforcement action against Amazon.com or Ebay.com or any of Defendants' customers purchasing through Amazon.com or Ebay.com.[12]
Second, Defendants contend that the Covenant does not cover all causes of action asserted by Plaintiffs. The Covenant explicitly refers to trademark infringement, unfair competition, and dilution. Those are the same three causes of action called out in the Nike covenant; although, Plaintiffs here have not alleged a dilution claim. Plaintiffs' five asserted claims are for trademark infringement, trademark counterfeiting, false designation of origin, common law unfair competition, and deceptive business practices under New York law. Defendants thus express concern that the Covenant does not cover the causes of action for trademark counterfeiting, false designation of origin and deceptive business practices. As Plaintiffs point out, however, all of its claims are grounded in trademark infringement even if dressed in a different formal cause of action. Thus, each claim for relief invokes the Lifeguard Trademarks, and several refer explicitly to the products in question as Infringing Merchandise. (Complaint ¶¶ 37-41, 44-47, 50-53, 59-61, 66-67.) And, even though not a model of clarity, the Covenant encompasses any action based on or "involving" trademark infringement and unfair competition "with respect to" the Trademarks. All five of Plaintiffs' claims in this case *128 involve trademark infringement and/or unfair competition related to the Trademarks and are thereby covered by the Covenant. Plaintiffs will be estopped from offering any narrower interpretation. See Already, LLC , 568 U.S. at 94, 133 S.Ct. 721 ("[Plaintiffs], having taken the position in court that there is no prospect of such [infringing product not covered by the covenant], would be hard pressed to assert the contrary down the road") (citing New Hampshire v. Maine , 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) ).
Third, the Covenant does not refer to "colorable imitations" of the trademarks litigated in the suit. While such language can be useful, it is not essential in a case like this one as compared to one like Already . Significantly, the asserted trademark in Already was for the specific design of a shoe, not a word mark. The claimed design elements of the mark included the stitching, the shape of the outer panels, and the ridge designs. A would-be infringer could fairly easily tweak some part of the shoe design, thus creating a "colorable imitation" of the registered design. Here, however, the Trademarks include two that have no design limitation.[13] Rather, the registrations are for the basic word mark "LIFEGUARD" regardless of font, color or other aspects of design. Accordingly, "colorable imitations" are of minimal concern, if any. It is difficult to imagine, for example, that Defendants would market products bearing a word such as "LITEGUARD" or some other misspelling, and Defendants certainly have stated no such intention to do so. The absence of the phrase "or colorable imitations" from the Covenant therefore is of no consequence.[14]
Fourth, Defendants contend that Ann Arbor "has demonstrated concrete plans to sell goods that go beyond what was sold prior to this suit." (Def. Mem. at 19.) The Court has addressed this above in analyzing whether Plaintiffs have met their burden. As explained, by already offering those additional products for sale, Defendants have demonstrated their own comfort in doing so with the Covenant in hand; and, regardless, the question is not whether Defendants plan to sell products not sold prior to suit, but rather, whether those goods would not be covered by the Covenant. As set forth above, they are.
Finally, Defendants make much of the fact that Plaintiffs offered the Covenant just short of trial, whereas the covenants in Nike and other cases were offered at earlier points in time. That may be so, but that fact is not relevant to the question of whether the Covenant is sufficient in scope to moot the parties' case or controversy. See Already, LLC , 568 U.S. at 99-100, 133 S.Ct. 721 (identifying availability of fee-shifting as a check on abusive litigation practices); cf. Fort James Corp. v. Solo Cup Co. , 412 F.3d 1340, 1348 (Fed. Cir. 2005) (covenant not to sue did not moot controversy when provided after jury verdict because the controversy had already been resolved).
In sum, the Covenant provided by Plaintiffs renders moot the case or controversy underlying each of Defendants' counterclaims for declaratory judgment. With dismissal *129 of Plaintiffs' claims, the Court no longer has subject matter jurisdiction. All claims and counterclaims therefore should be dismissed.[15]
III. Attorneys' Fees Should Not Be Awarded As The Case is Not Exceptional
In opposing Plaintiffs' motion to dismiss, Defendants request an award of attorneys' fees pursuant to Section 1117(a) of the Lanham Act, which permits courts to award attorneys' fees to prevailing parties in exceptional cases.[16] 15 U.S.C. § 1117(a). Defendants appropriately may be considered the prevailing party in this litigation. The case, however, is not exceptional and does not warrant an award of attorneys' fees.
A. Applicable Law Governing Lanham Act Fee Awards
Under the "American Rule," each party ordinarily must bear its own attorneys' fees. Courts may award attorneys' fees, however, where there is explicit statutory authority to do so. Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources , 532 U.S. 598, 602-03, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) ; Key Tronic Corp. v. United States , 511 U.S. 809, 819, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994). Plaintiffs' principal claims, and Defendants' counterclaims, are governed by just such a statute - the federal law governing trademarks, known as the Lanham Act. The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Accordingly, a defendant may be awarded attorneys' fees in a Lanham Act case if: (1) the defendant is the prevailing party and (2) the case is exceptional. The Court's award of fees must also be reasonable. The statutory provision is permissive, not prescriptive. Whether to award fees (and the amount) under this provision is therefore within the Court's discretion. Louis Vuitton Malletier S.A. v. LY USA, Inc. , 676 F.3d 83, 108-09 (2d Cir. 2012) ; see also Clarke v. Frank , 960 F.2d 1146, 1153 (2d Cir. 1992) ("Because attorney's fees are dependent on the unique facts of each case, the resolution of this issue is committed to the discretion of the district court") (citation omitted).
1. Prevailing Party Standard
Both plaintiffs and defendants may qualify as prevailing parties under the Lanham Act. Benihana of Tokyo, LLC v. Benihana, Inc. , No. 14 Civ. 224, 2018 WL 3574864, at *5 (S.D.N.Y. July 25, 2018) ; McDermott v. Monday Monday, LLC , No. 17 Civ. 9230, 2018 WL 1033240, at *2 (S.D.N.Y. Feb. 22, 2018). A prevailing party is "one who has been awarded some *130 relief by the court." Buckhannon , 532 U.S. at 603, 121 S.Ct. 1835. "The essence of being a prevailing party is achieving a material alteration of the legal relationship of the parties that is judicially sanctioned." New York State Federation of Taxi Drivers, Inc. v. Westchester County Taxi & Limousine Commission , 272 F.3d 154, 158 (2d Cir. 2001) (quoting Buckhannon , 532 U.S. at 604, 121 S.Ct. 1835 (quotation marks omitted) ).
2. Exceptional Case Standard
The Supreme Court has construed the term "exceptional case" under the identically-worded fee-shifting provision of the Patent Act, 35 U.S.C. § 285. Octane Fitness, LLC v. ICON Health & Fitness, Inc. , 572 U.S. 545, 553-54, 134 S.Ct. 1749, 188 L.Ed.2d 816 (2014). An exceptional case "is simply one that stands out from others with respect to the substantive strength of the party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." Id. Relevant factors to this determination include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." Id. at 554 n.6, 134 S.Ct. 1749 (quoting Fogerty v. Fantasy, Inc. , 510 U.S. 517, 534 n.19, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994) ). Under this standard, a district court determines the exceptional nature of a case on a case by-case basis, "considering the totality of the circumstances." Id. at 554, 134 S.Ct. 1749. The Second Circuit recently held that the Octane Fitness criteria apply to determining whether a case is exceptional under the Lanham Act. Sleepy's LLC. v. Select Comfort Wholesale Corp. , 909 F.3d 519, 530-31 (2d Cir. 2018).[17]
3. Reasonable Fees
Once the Court has decided a party is entitled to fees, it must determine whether the requested fees are reasonable. "A variety of factors informs the court's determination of whether a requested amount of attorneys' fees is reasonable or unreasonable, including the difficulty of the questions involved; the skill required to handle the problem; the time and labor required; the lawyer's experience, ability and reputation; the customary fees charged by the Bar for similar services; and the amount involved." F.H. Krear & Co. v. Nineteen Named Trustees , 810 F.2d 1250, 1263 (2d Cir. 1987) (citation and quotation marks omitted). To assess the amount of a reasonable fee, courts evaluate the "so-called 'lodestar' figure, which is arrived at by multiplying the number of hours reasonably expended on the litigation by a reasonably hourly rate." Kirsch v. Fleet Street, Ltd. , 148 F.3d 149, 172 (2d Cir. 1998) (citation, quotation marks, and alteration omitted); accord Millea v. Metro-North Railroad Co. , 658 F.3d 154, 166 (2d Cir. 2011). See generally John Wiley & Sons, Inc. v. Book Dog Books, LLC , 327 F.Supp.3d 606, 640 (S.D.N.Y. 2018) (summarizing reasonable fee standards).
B. Although Defendants May Be Deemed Prevailing Parties, This Case Is Not Exceptional
Pursuant to Plaintiffs' own request, the Court's adoption of this Report *131 and Recommendation will order dismissal of Plaintiffs' claims with this prejudice. Accordingly, Defendants will have prevailed on Plaintiffs' claims. See Buckhannon , 532 U.S. at 603, 121 S.Ct. 1835 (prevailing party is "one who has been awarded some relief by the court"). Both the dismissal with prejudice, and the Covenant - which Defendants have obtained through this litigation - materially alter the legal relationship of the parties. See id . at 604, 121 S.Ct. 1835 (essence of being a prevailing party is achieving a material alteration of the legal relationship of the parties that is judicially sanctioned). The dismissal of Defendants' counterclaims as moot does not change the calculus because, as a result of the litigation, Defendants will never face an infringement action or claim by Plaintiffs involving the Trademarks at issue. See Carter v. Incorporated Village of Ocean Beach , 759 F.3d 159, 165-66 (2d Cir. 2014) (voluntary dismissal with prejudice is an enforceable judgment on the merits for purposes of an award of attorneys' fees and costs, and thus effects a "material alteration of the legal relationship of the parties") (quoting Buckhannon , 532 U.S. at 604, 121 S.Ct. 1835 ).
Contrary to Defendants' arguments, however, this case does not qualify as exceptional. The case does not "stand out" from others with respect to the strength of Plaintiffs' litigation position or the manner in which it was litigated. On the merits, Plaintiffs' claims were premised on long-standing trademarks that had obtained incontestable status. None of Plaintiffs' claims were dismissed on summary judgment, and the District Judge denied summary judgment to Defendants on their affirmative defenses of fair use and abandonment, meaning that a reasonable juror could find for the Plaintiffs on those defenses. That is also the case for Defendants' assertion that the Lifeguard Trademarks are generic and no longer protectable; indeed, the District Judge directed the parties not to move for summary judgment on that issue because it was a disputed material issue of fact warranting being decided by a jury. (See Dkt. 229 at 2.) And whereas Defendants did not succeed on any aspect of its motion for summary judgment, Plaintiffs successfully secured dismissal of several of Defendants' more tenuous affirmative defenses. On this record, there is nothing exceptional that makes the case stand out from any other hard-fought trademark infringement case where the facts and legal outcome are hotly disputed. See, e.g., Otokoyama Co. Ltd. v. Wine of Japan Import Co. , 7 F. App'x 112, 115-16 (2d Cir. 2001) (affirming on summary order district court's determination that Lanham Act case was not exceptional even though defendant prevailed on genericness defense and presented proof of fraud on trademark office); Beastie Boys v. Monster Energy Company , 112 F.Supp.3d 31, 47 (S.D.N.Y. 2015) (despite jury finding of bad faith and intentional deception, case was not exceptional because defendant's arguments were reasonable and the verdict "was no foregone conclusion"); Gidatex, S.r.L. v. Campaniello Imports, Ltd. , 82 F.Supp.2d 136, 140, 148-49 (S.D.N.Y. 2000) (although jury found bad faith, court declined to award fees because defendant's litigation decisions were "justifiable," and the plaintiffs had not prevailed on every issue).
Perhaps that is why Defendants train their sights primarily on what they contend is Plaintiffs' unreasonable, bad faith litigation conduct as a basis to find this case exceptional. Here too, however, Defendants' arguments fail. Defendants first chide Plaintiffs for having "fully litigated" the case by bringing in individual owners and seeking statutory damages exceeding *132 two million dollars. (Def. Mem. at 23.) This Court is not aware of any case deeming a case exceptional because a party has "fully" litigated (as compared to, say, over-litigated). While one of Ann Arbor's two owners was dismissed from the case, the other was not. And the amount of Plaintiffs' demand is not unreasonable nor particularly salient - the amount of the demand does not alter the need to litigate damages, and, in any event, the amount of damages would for the factfinder to determine regardless of Plaintiffs' demand.
Defendants next take Plaintiffs to task for forcing Defendants to file multiple motions to compel that were largely successful, moving to exclude Defendants' experts, and lodging objections to the Magistrate Judge's orders. (Def. Mem. at 23.) Defendants far distort the record. Defendants' motions to compel were both denied and granted in part. (Dkt. 73, 103.) Meanwhile, the Court denied Defendants' request for sanctions in connection with both motions and denied sanctions yet again when Defendants moved for contempt. (Dkt. 73 at 12-13; 103 at 14; 162 at 9-10.) Although the Court rejected some of Plaintiffs' arguments, the Court nevertheless found them to have "substantial justification" (Dkt. 73 at 13), while finding (in one motion) that Defendants did not always "have its facts exactly right" (Dkt. 162 at 9).[18] As for the experts, both parties moved to exclude, both parties lost, and both parties objected to the rulings against them. (Dkt. 134, 152, 182.) Meanwhile, Defendants ignore that their motion to dismiss was denied to the extent not rendered moot (Dkt. 88), and Plaintiffs' summary judgment motion was comparatively more successful than was Defendants' motion. (See, e.g. , Dkt. 229 at 14-19) (dismissing several of Defendants' defenses as lacking any support). In short, Plaintiffs' litigation conduct was no less, and perhaps more, reasonable than Defendants.
Lastly, Defendants charge Plaintiffs with bad faith for their "more recent conduct." (Def. Mem. at 23.) Although Defendants set forth five such instances, they boil down to two, both of which concern the Covenant not to sue: (1) regarding content, Plaintiffs changed the wording of the Nike covenant to water it down, yet represented to the Court that Plaintiffs' Covenant was "largely identical" to Nike's, and (2) regarding timing, Plaintiffs waited to provide the Covenant until after Defendants had already incurred the expense of preparing for trial, while defaulting on Plaintiffs' own obligations to file trial materials. (Def. Mem. at 23-24.) None of these allegations amount to bad faith.
The Court already has addressed the content differences above in finding the Covenant sufficient to moot the counterclaims. Despite the different wording, the two covenants are largely identical in effect. Moreover, Exhibits 1 and 2 to counsel's declaration in support of Plaintiffs' motion are the Lifeguard Covenant and the Nike covenant respectively. Plaintiffs did not hide anything from the Court.[19]
*133 As for the timing, the Court agrees that it might have been handled better. While Plaintiffs sought an expedited conference with the Court to discuss the Covenant and their impending motion to dismiss, they still contributed to a scenario in which Defendants expended resources on completing pretrial filings and Plaintiffs did not. In an optimal setting, Plaintiffs might have found a way to more efficiently address the matter with Defendants to see if they would join in holding off on trial preparation pending filing and determination of Plaintiffs' motion. That said, however, Defendants have offered nothing that suggests the timing was motivated by bad faith. Plaintiffs took a huge risk in deciding not to prepare and file trial materials. If their motion failed, they could well have been left facing trial, without the benefit of any opposition to Defendants' motions in limine, having waived objections to Defendants' exhibits and deposition designations, and the like. Plaintiffs chose where to concentrate their resources. While not providing Defendants that same opportunity, Plaintiffs' conduct hardly rises to the level of misconduct that would make for an exceptional case.
As noted earlier, the Court is aware that Plaintiffs did not provide the Covenant until the case was at the precipice of trial. In Nike v. Already , both the District Court and Second Circuit denied awarding attorneys' fees to the defendant, and in finding the case not to be exceptional, both courts noted that the plaintiff's voluntary dismissal came early in the litigation. 663 F.3d at 99 ; 2011 WL 310321, at *8. The Supreme Court did not address attorneys' fees in Already v. Nike , but it did note that the Lanham Act's fee-shifting provision for exceptional cases was a "check on abusive litigation practices."[20] 568 U.S. at 99-100, 133 S.Ct. 721. One could reasonably suggest that a fee award would be appropriate where a "repentant" party gives a covenant to sue but delays in doing so to force the other party to expend further resources on the litigation while the covenantor does not. The fee award could be limited to fees incurred during the delay period.[21] Such an award would further the "exceptional case" factors of compensating the party who expended resources and deterring bad actors who gratuitously run up their adversary's legal costs.
*134 But, as noted, the record here does not support a finding that Plaintiffs' conduct was abusive or motivated to inflict unnecessary cost on Defendants. Defendants emphasize that Plaintiffs "knew that they were going to present a covenant not to sue at least as early as August 29, 2018" but did not request a pre-motion conference until almost two months later. (Def. Mem. at 20.) Defendants overlook that as of August 29, 2018, they too "knew that [Plaintiffs] were going to present a covenant not to sue;" indeed, Defendants' counsel admits that Plaintiffs' counsel informed them of that fact on August 29 during a phone conversation. (Heed Decl. ¶ 24.) Had Defendants been concerned about proceeding with trial preparations while waiting for the forthcoming covenant, Defendants could have conferred with Plaintiffs or made a motion to the Court to address the matter.
In short, this case is not exceptional and does not warrant exercise of the Court's discretion to award attorneys' fees.
Conclusion
For the foregoing reasons, I recommend (i) dismissing Plaintiffs' complaint with prejudice pursuant to Fed. R. Civ. P. 41(a)(2) ; (ii) dismissing Defendants' counterclaims as moot without prejudice; (iii) denying Defendants' request for summary judgment; and (iv) denying Defendants' request for an award of attorneys' fees. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of the Honorable Lorna G. Schofield, United States Courthouse, 40 Foley Square, New York, New York 10007, and to the Chambers of the undersigned, at United States Courthouse, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will result in a waiver of objections and will preclude appellate review.
Dated: March 12, 2019

Declaration of Ruben Azrak, dated February 5, 2019 ("Azrack Decl.") (Dkt. 265), ¶ 2. The four registrations are numbers 355,543 (LIFE GUARD, for swim trunks); 562,509 (LIFEGUARD, stylized, for men's underwear); 2,754,820 (LIFEGUARD, for variety of goods in clothing and accessories); 3,800,325 (same). (Complaint, Ex. A.)

The oldest of the Trademarks (No. 355,543) has been registered for over 80 years; the youngest (3,800,325) for approximately 10 years. (See Complaint, Ex. A, p. 1.)

Declaration of Benjamin Tebele, dated October 19, 2017 ("Tebele Decl.") (Dkt. 203), ¶ 7.

Declaration of Jerry Kozak, dated January 30, 2019 ("Kozak Decl.") (Dkt. 261), ¶¶ 4-6.

Another owner, Richard Winowiecki, was originally named as a defendant but was dismissed from the case on summary judgment. (Dkt. 229.)

Declaration of Thomas P. Heed, dated Jan. 30, 2019 ("Heed Decl.") (Dkt. 260), at Ex. H.

In the same order, the District Judge referred the matter to the undersigned for report and recommendation. (Dkt. 250.)

Declaration of Gerald Grunsfeld, dated January 9, 2019 ("Grunsfeld Decl.") (Dkt. 258), at Ex. 2.

As an example, Defendants cite Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC, No. 08 Civ. 442, 2016 WL 815205 (S.D.N.Y. Feb. 29, 2016). In that case, the court focused its concerns on the authenticity and execution of the covenant itself and the questionable honesty of the defendants. 2016 WL 815205, at *14. Those concerns are not at issue here. Deficiencies that other courts have found also are not present here. See Revolution Eyewear, Inc. v. Aspex Eyewear, Inc. , 556 F.3d 1294, 1300 (Fed. Cir. 2009) (covenant insufficient because it did not cover future sales of current products); Higher One, Inc. v. TouchNet Information Systems, Inc. , No. 3:10CV1435, 2014 WL 4798546, at *5 (D. Conn. Sept. 26, 2014) (covenant insufficient because it expressly covered only current products, omitting past products).

In affirming the Second Circuit's decision, the Supreme Court described the Second Circuit's holding regarding these factors and, while not expressly adopting or rejecting that formulation, proceeded to apply those same factors in evaluating the covenant not to sue at issue. See Already, LLC , 568 U.S. at 93-94, 133 S.Ct. 721 (terms of covenant, and past-future products), 94-95 (intent to engage in uncovered activity).

The alteration "[successors or related entities and their customers]" is from the Second Circuit opinion, the remaining alterations are the Court's.

In assessing the sufficiency of the Covenant, the Court may appropriately consider the covenantor's representations made in multiple documents or multiple settings. See, e.g., Already, LLC, 568 U.S. at 94, 133 S.Ct. 721 (relying on Nike's statements in court together with language of the covenant itself); Organic Seed Growers , 718 F.3d at 1357-58 (even in the absence of a covenant not to sue, defendant's representations to the court and on the internet were sufficient to render moot the declaratory judgment action).

The two unstylized Lifeguard word-mark registrations are 2,754,820 and 3,800,325.

Earlier in their brief, Defendants point to an additional variation between Plaintiffs' Covenant and the Nike Covenant. Specifically, Defendants contrast Plaintiffs' language "... pertaining to a cause of action based on ..." with Nike's "... on account of any possible cause of action based on ...." (Def. Mem. at 12-13.) Notwithstanding the different verbiage, the Court does not deem the Plaintiffs' Covenant materially, if at all, less broad than Nike's covenant.

Because all claims should be dismissed, Defendants' request for summary judgment should be denied. Defendants' asserted basis for revisiting summary judgment is that Plaintiffs' Covenant is additional evidence of Plaintiffs' abandonment of its trademarks through failure to police and naked licensing. (Def. Mem. at 21.) Whether that is so, however, will be for another litigant to argue.

Although Defendants did not raise it, Fed. R. Civ. P. 41(a)(2) provides a potential alternative vehicle for a fee award. That provision, under which Plaintiffs seek voluntary dismissal, allows the Court to dismiss claims on terms the Court deems proper. Accordingly, some courts have awarded fees as a term of dismissal. They do so, however, when dismissal is without prejudice and thereby exposes defendants to potential duplicative litigation. Colombrito v. Kelly , 764 F.2d 122, 133-34 (2d Cir. 1985). Where, as here, the dismissal is with prejudice , courts rarely will award attorneys' fees as a term of the dismissal. Id. ("when a lawsuit is voluntarily dismissed with prejudice under Fed. R. Civ. P. 41(a)(2), attorney's fees have almost never been awarded") (emphasis in original).

Prior to Octane , an "exceptional case" required a finding of bad faith, fraud or willful infringement. Penshurst Trading Inc. v. Zodax, L.P. , 652 F. App'x 10, 11-12 (2d Cir. 2016) (summary order) (citing Louis Vuitton , 676 F.3d at 111 ). Although such a finding of culpable conduct was a prerequisite, it was not sufficient to automatically warrant imposition of fees. Mister Softee of Brooklyn, Inc. v. Boula Vending Inc. , 484 F. App'x 623, 624 (2d Cir. 2012) (summary order).

Defendants state that the Court "found that Plaintiffs' assertions in the Second Motion to Compel were frivolous." (Def. Mem. at 23, citing Dkt. 103 at 11.) That is an overstatement. The Court's characterization was in reference to one argument, not multiple "assertions." And, as noted, the Court denied sanctions, a point omitted by Defendants in their recounting of events. Defendants also overstate the extent of Plaintiffs' objections to the Magistrate Judge's discovery rulings. When Plaintiffs objected to the outcome of Defendants' second motion to compel, Plaintiffs narrowly objected to only one of several issues that had been addressed. (Dkt. 104.)

Defendants' attempt to tar Plaintiffs with bad faith is ironic given that the District Judge, in ruling on summary judgment, found that Plaintiffs adduced evidence of Defendants' bad faith, specifically "evidence showing that Defendant Kozak, in his deposition, stated that he knew that LIFEGUARD was a trademark for apparel prior to selling his products, that he directed the art department of Ann Arbor to copy Plaintiffs' design specifically and that he sought to 'bury' this evidence during discovery." (Dkt. 229 at 10.)

In alluding to this "check," the Court cited Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc. , 484 U.S. 49, 67 n.6, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), which explained that "an award of litigation costs can protect 'from the suddenly repentant defendant.' " 568 U.S. at 100, 133 S.Ct. 721. The statute at issue in Gwaltney was an environmental law for which the legislative history expressly stated that "the award of costs should extend to plaintiffs in actions which result in successful abatement but do not reach a verdict. For instance, if as a result of a citizen proceeding and before a verdict is issued, a defendant abated a violation, the court may award litigation expenses borne by the plaintiffs in prosecuting such actions." 484 U.S. at 67 n.6, 108 S.Ct. 376 (citing S.Rep. No. 92-414, p. 81 (1971); 2 Leg.Hist. 1499, the legislative history for 33 U.S.C. § 1365(d) ).

Attorneys' fees may be awarded for only a portion of litigation, such as when a plaintiff continues to pursue a claim even though an intervening decision clearly makes such a claim unviable. See, e.g., Contractual Obligation Productions, LLC v. AMC Networks, Inc. , 546 F.Supp.2d 120, 131 (S.D.N.Y. 2008) (plaintiff liable for only those attorneys' fees incurred after court's earlier decision denying preliminary injunction "unequivocally" foreclosing Lanham Act theory).